**Milberg Tadler Phillips Grossman LLP**
DAVID E. AZAR (SBN 218319)
11766 Wilshire Blvd., Suite 500
Los Angeles, California 90025
Telephone: (213) 617-1200
Facsimile: (212) 868-1229
dazar@milberg.com

HENRY J. KELSTON
ANDREI RADO
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
hkelston@milberg.com
arado@milberg.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MARCIA KOSSTRIN TRUST AND PROFESSIONAL HOME IMPROVEMENTS INC. RETIREMENT PLAN,<br><br>Plaintiffs,<br><br>- against -<br><br>DIRECT LENDING INVESTMENTS, LLC, BRENDAN ROSS, BRYCE MASON, FRANK TURNER, RODNEY OMANOFF, and QUARTERSPOT INC.,<br><br>Defendants | **CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, BREACHES OF FIDUCIARY DUTIES, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES, AND FRAUDULENT INDUCEMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, upon personal knowledge as to allegations relating to themselves and their own acts and upon information and belief and investigation of their counsel as to all other allegations, hereby allege as follows:

I.      **INTRODUCTION AND SUMMARY OF ALLEGATIONS**

1.      Plaintiffs and members of the putative class are limited partners (the "Limited Partners") in Direct Lending Income Fund, L.P. (the "Fund" or the "Partnership") a Delaware limited partnership that lends money through affiliates to small and medium sized businesses.

Class Action Complaint

2.    The Fund's principal place of business is in Glendale, California. The Fund is a "feeder fund": its capital is invested in another fund, DLI Capital Inc. (the "Master Fund"), and the Master Fund (also through holding companies and subsidiaries) in turn invests in various businesses. In addition to investing for the Fund, the Master Fund also invests for Direct Lending Income Feeder Fund, Ltd, a Cayman-Island corporation for non-U.S. domiciled investors (the "Offshore Fund"). The Fund is far larger than the Offshore Fund, accounting for approximately 75% of the total funds in the Master Fund. The Fund and Offshore Fund are referred to collectively as the "Funds." The Funds share the same general partner and investment manager, defendant Direct Lending Investments LLC (the "General Partner").[1]

3.    This action concerns the Fund's misrepresentations about its due diligence leading to its disastrous investment in defendant VOIP Guardian Partners I, LLC ("VOIP Guardian"), and, separately, the Fund's materially inflated financial reports to Limited Partners caused by its materially inflated reported fair value for investments in QuarterSpot, Inc. ("QuarterSpot"), a lending platform for small businesses.

4.    VOIP Guardian provides "factoring" financing to small telecommunications companies providing services to larger telecommunications companies. Under its factoring arrangements, VOIP Guardian utilizes the money provided to it by the Funds to purchase accounts receivable of the small telecoms at a discount.  As of December 31, 2018, approximately 25% of the Funds' capital was invested in VOIP Guardian.

5.    On February 11, 2019, the Limited Partners learned by letter from defendant Brendan Ross, founder and CEO of the Funds and the General Partner, that the Funds were the victims of likely misconduct.  According to Ross, $160 million, of a total of $190 million outstanding to VOIP Guardian, may not be recoverable. According to the letter, VOIP Guardian defaulted on its payments to the Funds because its own payment obligors defaulted on payments owned to VOIP Guardian. The letter further stated: "We now suspect that the cessation of payments is the likely result of misconduct

---

[1] In this complaint, references to Fund investments are to direct investments (in the Master Fund) and indirect investments through the Master Fund and its various holding companies, subsidiaries and any other affiliated entities.

1  (although we have not determined by whom),” and that counsel had been engaged to investigate and

2  consider litigation against VOIP Guardian and/or VOIP Guardian's obligors, and that the U.S.

3  Attorney's Office, Major Frauds Section, was contacted.

4        6.     The letter also advised that limited partner withdrawals from the Funds were frozen

5  because the General Partner invoked a provision in the Limited Partnership Agreement (“LPA”)[2]

6  allowing a halt of withdrawals in the interest of the Fund. and that the Funds was closed to new

7  investors. *See* Ex. A.

8        7.     Then, on March 19, 2019, in another letter from the General Partner, the Limited

9  Partners learned that in addition to the near-total loss of the VOIP Guardian investment, the value of

10 the Fund's investments in QuarterSpot may have been materially misstated in reports to Limited

11 Partners from 2014 through 2017. The letter also disclosed that defendant Ross has resigned as CEO

12 and managing member of the General Partner, and all positions related to the Funds, after the

13 Securities and Exchange Commission notified the General Partner that it is investigating “various

14 matters concerning the [General Partner], including the Funds' QuarterSpot and VOIP Guardian

15 investments.” The General Partner also announced that VOIP Guardian had filed for Chapter 7

16 bankruptcy.

17       8.     On March 22, 2019, the SEC filed an action in the Central District of California against

18 the General Partner, accusing it of materially misstating the value of the QuarterSpot investments by

19 approximately $53 million, and collecting approximately $11 million in overcharged fees.[3] Among

20 other things, the General Partner, together with QuarterSpot, falsified borrower payment information

21 and reported hundreds of monthly payments by QuarterSpot borrowers that were never made. The

22 SEC complaint alleges fraud pursuant to the Investment Advisers Act,  the Securities Exchange Act

23 of 1934,  the Securities Act of 1933. The SEC also announced that it has obtained consent to appoint

24 a receiver to preserve investor assets.

25 _____

26 [2] Seventh Amended and Restated Partnership Agreement of Direct Income Lending Fund, L.P.,

27 attached hereto as Exhibit A.

28 [3] Securities and Exchange Commission v. Direct Lending Investments, LLC No. 19-cv-2188 (C.D. Cal. Mar. 22, 2019) (the “SEC Action”).

9. By materially misstating the value of the QuarterSpot investments, the General Partner and Ross falsely inflated the value of the Fund and thereby fraudulently induced Plaintiffs and other current Limited Partners to purchase their limited partnership interests at inflated prices.

10. By not accurately reporting to them the true financial condition, valuation and risk in the Fund relating to the VOIP Guardian investments, the General Partner and the Individual Defendants breached the Limited Partnership Agreement, breached their fiduciary duties to the Limited Partners, deceived the Limited Partners concerning the value and risks concerning these investments, and deprived the Limited Partners of various contractual rights, including a meaningful right to withdraw from the Fund, causing them to incur significant loss of capital.

## II.    THE PARTIES

11. The Plaintiff entities are investment vehicles for Jeffrey Greenberg and his spouse Marcia Kosstrin. As of November 31, 2018, the date of the last statement received by Limited Partners, Plaintiffs accounts had a combined value of $758,000.

12. Plaintiff Marcia Kosstrin Trust is a Connecticut trust. The Kosstrin Trust initiated its investment in the Fund in on April 1, 2018 by signing the Subscription Agreement (defined below) and depositing $280,000. The trustee for the Marcia Kosstrin Trust is Jeffrey Greenberg. In its last account statement, the Kosstrin Trust showed a value of $500,000.

13. Plaintiff Professional Home Improvements Inc. Retirement Plan is a self-directed retirement plan. Professional Home Improvements Inc. initiated its investment in the Fund on September 1, 2015, by signing the Subscription Agreement and depositing $100,000. The trustee for the plan is Jeffrey Greenberg. As of its last account statement, the Trust showed a value of $258,395.

14. Plaintiffs, like all Limited Partners, initiated their investment in the Fund by signing a subscription package delivered to them by the General Partner (Subscription Agreement) that includes the Subscription Agreement, Limited Partnership Agreement, and Confidential Private Placement Memorandum.[4]    The parties to the Limited Partnership Agreement are Plaintiffs and the General

---

[4] In this complaint, "PPM" refers to the Confidential Private Placement Memorandum dated September 2018 (attached hereto as Exhibit B).  The memoranda by which Limited Partners invested in the Fund have been substantively similar in all relevant ways.

1  Partner. The limited partnership interests are not registered under the Securities Act of 1933, or under

2  the laws of any state. The Limited Partnership interests do not trade on any exchange and there is no

3  public market for them. Limited Partnership interests take the form of Class A interests, which is, and

4  has been, the only class of Partnership interests.

5       15.    Defendant Direct Lending Investments, LLC is the General Partner and Investment

6  Manager of the Fund. It is organized under the laws of California and maintains its principal place of

7  business at the same location as the Fund, at 550 North Brand Boulevard, 20th Floor, Glendale

8  California, 91203.   The General Partner manages the Fund and its investments and is a registered

9  investment advisor.

10       16.    Defendant Brendan Ross founded the General Partner in 2012, and at all relevant times

11  served as its Chief Executive Officer until his departure in March 2019. Ross has held various other

12  positions in the General Partner including as its Portfolio Manager (per the October 2016 Private

13  Placement Memorandum). Ross exercised control over the General Partner and is referred to in the

14  Fund's offering memoranda as "the Principal." Ross served as a member of the General Partner's

15  Management Committee and its Investment Committee. The Limited Partnership Agreement is

16  signed by Ross on behalf of the General Partner.

17       17.    Defendant Bryce Mason has served as the Executive Vice President of Research of the

18  General Partner Since July 2015. In that capacity Mason's responsibilities encompassed "direct[ing]

19  the General Partner's quantitative research efforts, including assisting with investment due diligence,

20  collecting data to describe the Partnership's portfolio, and monitoring collateral performance. PPM

21  at 11. In addition, until October 2016, Mason served as the General Partner's Chief Investment

22  Officer, and was "responsible for the initial and ongoing due diligence of investments; the design of

23  portfolio monitoring tools; performing research and analysis related to the performance of the

24  portfolio." October 2016 Private Placement Memorandum at 15. As Chief Investment Officer and

25  Executive Vice President of Research, Mason served on both the General Partner's Investment

26  Committee and its Management Committee. On a Form D filed by the General Partner with the SEC

27  on September 21, 2018, Mason is listed as an Executive Officer of the General Partner with the title

28

of Executive Vice President, Research. His address is given as the address of the Fund Entities (defined below) in Glendale, California.

18.     Defendant Frank Turner served as Chief Investment Officer of the General Partner from October 2016 to January 2019. In that capacity Turner was "responsible for sourcing and conducting due diligence on prospective investments." PPM at 10. As Chief Investment Officer, Turner served as a member of the General Partner's Investment Committee and Management Committee. On a Form D filed by the General Partner with the SEC on September 21, 2018, Turner is listed as an Executive Officer of the General Partner with the title of Chief Investment Officer. His address is given as the address of the Fund Entities in Glendale, California.

19.     Defendants Ross, Mason, and Turner are referred to as the "Individual Defendants."

20.     Defendant Rodney Omanoff resides in or near Los Angeles, California. Omanoff is the founder and principal of VOIP Guardian and has stated that he "supervise[s] the daily operations" of VOIP Guardian, LLC." According to the bankruptcy petition filed in the Central District of California on March 11, 2019,[5] VOIP Guardian Partners I, LLC, is located at 1221 Ocean Avenue, Unit 507, Santa Monica, California 90401. From August 1, 2016 through July 31, 2018, VOIP Guardian Partners I, LLC was located at 301 Arizona Avenue, Suite 220, Santa Monica, California 90401. The petition names VOIP Guardian, LLC as the Sole Member of VOIP Guardian Partners I, LLC. The sole manager of the Board of Managers of the Sole Member is Omanoff America, LLC. The sole manager of the board of managers of Omanoff America, LLC is Rodney Omanoff. In other words, all the VOIP Guardian entities are controlled by Omanoff and Omanoff America, LLC.

21.     Defendant QuarterSpot, Inc. ("QuarterSpot") maintains its principal place of business in New York City, at 333 Seventh Avenue, Suite 1402, New York, NY 10001. QuarterSpot is licensed as a California Finance Lender, holding License Number 603K646 from the Califonia Department of Business Oversight. As alleged herein, QuarterSpot worked with the General Partner to inflate the performance of the Partnership's investments through QuarterSpot.

---

[5] *Petition of VOIP Guardian Partners I, LLC*, Case 2:19-bk-12607-BR (C.D. Cal. March 11, 2019).

### III.    JURISDICTION AND VENUE

22.     The Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one member of the putative class is a citizen of a State different from at least one defendant.

23.     As alleged above, defendants reside and/or do business in California, and many of the acts or omissions that form the basis of the claims took place in California. The Partnership Agreement has a Delaware choice of law clause and a California jurisdiction and forum clause:

> 11.02 Applicable Law. This Agreement shall be governed by, construed under, and enforced and interpreted in accordance with, the laws of the State of Delaware.

> 11.03 Jurisdiction. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of California, and each of the parties consents to the jurisdiction of such courts in any such action or proceeding and waives any objection to venue laid therein

Partnership Agreement at 25.

### IV.    ALLEGATIONS COMMON TO ALL CLAIMS

#### A.    Structure and Purpose of the Fund Entities and Compensation of the General Partner

24.     The Fund Entities, which include the Partnership, the Offshore Feeder Fund, and DLI Capital (the Master Fund) and all their affiliates and subsidiaries, are all under the control of the General Partner [6] as illustrated in this chart from the Private Placement Memorandum: [7]

---

[6] "Fund Entities" refers to the Funds and the Master Fund and its direct wholly owned subsidiaries. PPM at 15.

[7] The chart "does not include all Fund Entities, affiliates, investors, members and partners that may be in existence from time to time."

1
2
3
4
5
6
7
8
9
10
11
12



¹ Available to United States domiciled investors. No investors may have a 10% or greater ownership interest in the entity.
² Available to non-United States domiciled investors. No investors may have a 10% or greater ownership interest in the entity.
³ The Direct Lending Income Feeder Fund Ltd. and Direct Lending Income Fund L.P. together own 100% of DLI Capital, Inc. The proportional ownership varies.

13  25.   To become a Limited Partner, an investor must receive, complete and return a
14  Subscription Agreement, which includes a Private Placement Memorandum and Limited Partnership
15  Agreement.

16  26.   The Partnership is a pass-through entity, a "feeder fund" that takes the capital
17  contributions of the Limited Partners and gives it to the Master Fund for investment, to be managed
18  by the General Partner. The Master Fund generally issues shares of common stock to the Partnership
19  in proportion to its investment in the Master Fund at the time of each investment by an investor in the
20  Partnership.

21  27.   The Partnership is a part of a master-feeder structure and seeks to achieve its
22  investment objective by investing in a revolving loan and equity in the "Master Fund", DLI Capital,
23  Inc., which invests directly or indirectly in Collateral Assets. The Partnership Agreement similarly
24  establishes that the purpose of the Partnership formally is to purchase shares in the Master Fund:

25        Purpose of Partnership. (a) The Partnership is organized for the purpose of investing
26        in Investments consisting primarily of Master Fund shares and Master Fund Loans;
      and engaging in all activities and transactions as the General Partner may deem
27        necessary or advisable in connection therewith and doing such other lawful acts as
      the General Partner may deem necessary or advisable in connection with the
28        maintenance and administration of the Partnership.

LPA at 2.

28.     The Fund investments comprise loans to various businesses. As described in the Private Placement Memorandum:

> Direct Lending Income Fund, L.P. (the "Partnership") seeks to generate attractive current income through opportunistic investments across the credit markets, including, through investing in certain loans and debt obligations (including short-term loans, revolving loan facilities, lines of credit, and real estate loans), and other obligations of non-bank lenders and small- and medium-sized businesses (the "Investments").

PPM at 2.

29.     The Master Fund utilizes holding companies and subsidiaries to invest the Fund's capital in short term loans, lines of credit, receivables, and other debt obligations:

> The Master Fund generally invests in Investments through one or more holding vehicles (referred to hereinafter as "Holding Companies"). In addition, from time-to-time, the Master Fund may also seek to enhance returns on its loan portfolio through equity participation in connection with its debt investments. References in this Memorandum to investments made by the Master Fund include references to investments made directly by the Partnership, a Holding Company (whether acting directly or as the beneficiary of a custodial relationship with a third party), or any other Fund Entity (as defined below) or subsidiary thereof that may, from time to time, make or acquire Investments, and any successor to any such persons (a "DLI Lending Entity").

PPM at 5.

30.     Pursuant to the Limited Partnership Agreement, the Partnership pays the General Partner indirectly, through the Master Fund. *See* LPA at 17.

31.     Pursuant to the Private Placement Memorandum, which the Limited Partnership incorporates, the General Partner is paid a performance fee of 20% of each month's profit of the Master Fund. The management fee is 0.08333% per month (1% annual) of the gross asset amount of the Master Fund. *See* PPM at 24, 27. This fee is borne by the Limited Partners.

**B.     Value of Limited Partnership Interests**

32.     The value of a Limited Partner's interest in the Fund is determined by the proportion of the Limited Partner's capital account to the total of the capital accounts of all Partners in the Fund

which, in turn, reflects numerous factors including the current value of the Limited Partnership's assets, previous allocations to capital accounts, interest income, and fees:

> 3.01 Capital Accounts. (a) A Capital Account shall be established and maintained on the books of the Partnership for each Partner. The amount of each Partner's initial capital contribution shall be credited to its Capital Account at the beginning of the Accounting Period in which such capital contribution is accepted, less the amount of any Brokerage Commission paid in connection with the capital contribution.
>
> \* \* \*
>
> 3.02 Allocations of Profits and Losses. The Partnership will allocate profits and losses for each Accounting Period as follows: (a) Master Fund Net Profits and Master Fund Net Losses with respect to each class and series of Master Fund shares shall be allocated to the Capital Accounts of the Partners with an interest in the Master Fund shares as of the last day of the Accounting Period in proportion to each such Partner's Master Fund Allocation Percentage. (b) Any Net Investment Income for each Accounting Period shall be allocated to each Partner's respective Capital Account as of the last day of the Accounting Period in proportion to the Partner's Allocation Percentage.
>
> \* \* \*
>
> "Master Fund Allocation Percentage" shall mean with respect to any Partner and any class or series of Master Fund shares for any Accounting Period, the quotient obtained by dividing (i) the value of the Capital Account balance for such Partner with an interest in the specific class or series of Master Fund shares as of the beginning of such Accounting Period by (ii) the Capital Account balance for all Partners who have an interest in the same class or series of Master Fund shares as of the beginning of such Accounting Period who are invested in the same class and series of Master Fund shares (in each case, after giving effect to purchases and redemptions of debt and equity of the Master Fund).

LPA at 3-5, 32.

33. The adjustment to capital accounts occurred every Accounting Period, which spanned no more than a month. *See* LPA at 30.

**C.     Limited Partners' Contractual Right of Withdrawal**

34. The Limited Partnership interests are not registered pursuant to the federal securities laws or state laws, are not listed on any exchange, and are not freely transferrable. Transfer or liquidation of the Limited Partnership interests is strictly limited by the Limited Partnership Agreement. The Interests will not be registered under any securities laws and may not be transferred except as permitted under the Securities Act, applicable state securities laws, pursuant to registration

1  or exemption therefrom, and in accordance with the Partnership Agreement. A public market does

2  not currently exist for the Interests, and no such market is expected to develop. Accordingly, the right

3  to withdrawal was, and remain, critically important to Limited Partners who would not have invested

4  in the Partnership without that right.

5      35.    In relevant, part the Agreement grants the Limited Partners the right to withdraw their

6  investments as follows:

7      4.01 Withdrawals of Limited Partners' Capital Account.

8      (a) A Limited Partner will be generally permitted to make withdrawals from its
       Capital Account (except to the extent of its interest in any unrealized Side Pocket

9      Investments) as of the last day of any calendar month, or such other date as the
       General Partner may determine in its sole discretion (each such date, a "Withdrawal

10     Date") subject to the provisions of this Section 4.01, by delivering to the General
       Partner a request in writing for withdrawal in the form of Appendix A to the

11     Subscription Agreement; provided that the Partnership receives at least 35 days'
       written notice of such withdrawal prior to the applicable Withdrawal Date. (b) The

12     General Partner may, in its sole discretion, cause the Partnership to declare and pay
       special distributions to all Limited Partners, which shall be paid on a pro rata basis

13     to all Partners based on their relative Capital Accounts as of the record date of the
       distribution. All withdrawals will be net of any accrued losses.

14

15 LPA at 9.

16     36.    The limitations on withdrawals are as follows:

17

18     4.03 Limitations on Withdrawals. The General Partner may suspend the right of
       withdrawal or postpone the date of payment (i) for any period during which a delay

19     is reasonably necessary, as determined in the sole discretion of the General Partner,
       in order to effectuate an orderly liquidation of the Partnership's investments in a

20     manner that does not have a material adverse impact on the Partnership or the non-
       withdrawing Limited Partners; (ii) during any Suspension Period; or (iii) during

21     any period in which the General Partner determines in good faith such a suspension
       is necessary or advisable to protect the Partnership. At the conclusion of such

22     period, the General Partner shall resume permitting withdrawals otherwise
       permitted pursuant to this Article IV, and shall resume any payments pursuant to

23     such withdrawals as soon as reasonably practicable.

24 LPA at 11. This section was invoked, halting all withdrawals, by the General Partner after the VOIP

25 Guardian fiasco, and communicated to Limited Partners in the letter of February 11, 2019.

26

27

28

Class Action Complaint

### D. Reporting Obligations of the General Partner

37.     The Limited Partnership Agreement obligates the General Partner to provide Limited Partners with audited financial reports, and to otherwise account for the Partnership's business pursuant to Generally Accepted Accounting Principles ("GAAP"):

> 7.01 Accounting Methods. The General Partner shall prepare the accounting statements for the Partnership on an accrual basis in accordance with GAAP, and shall be empowered to make any changes of accounting method that it shall deem advisable, including electing to amortize certain organizational and offering expenses.
>
> \* \* \*
>
> 7.04 Reports to Partners. The General Partner will furnish audited financial statements to all Limited Partners within a reasonable time period, following the conclusion of each Fiscal Year . . . [a]ll Limited Partners will also receive unaudited performance reports and such other information as the General Partner determines on a monthly basis.

38.     In preparing reports to the Limited Partners, the Partnership Agreement further requires the General Partner to value investments fairly and in good faith:

> "Fair Value" means the value of any Investments or other assets of the Partnership as determined by the General Partner in good faith. In general, the Fair Value of Master Fund shares shall be their net asset value as reported by the Master Fund, and the Fair Value of Master Fund Loans shall be the principal, interest and other amounts owing to the Partnership thereunder.

LPA at 21.

### E. The General Partner and Individual Defendants' Fiduciary Duties to Limited Partners

39.     Under Delaware law, general partners owe a fiduciary duty to the limited partners in a partnership, as do individuals who control the general partner.

40.     Controlling managers of a corporate general partner also owe a fiduciary duty to the limited partners in a partnership

41.     As specifically alleged above, the Individual Defendants were the controlling managers of the General Partner.

42.     There is no specific language in the Limited Partnership Agreement or any other agreement between the parties that restricted or eliminated the fiduciary duties of the General Partner or its controlling managers.

**F.     The General Partner's Obligations to Evaluate and Monitor Investments**

43.     Pursuant to the Partnership Agreement the General Partner has exclusive management and control of the Fund's business:

> Except as otherwise provided in this Agreement, the General Partner will have exclusive management and control of the business of the Partnership and will (except as otherwise provided in any other agreements) make all decisions affecting the Partnership and the Partnership's assets.

Partnership Agreement at 13, ¶5.02.

44.     Limited Partners have no control over the affairs of the Fund, and cannot vote for or remove the General Partner or its agents, and cannot vote or appoint General Partner employees: *See* LPA at 19.

45.     The General Partner has investment management agreements with the Funds, the Offshore Fund, and the Master Fund, giving it exclusive control over investment decisions. *See* PPM at 12.

46.     The General Partner is responsible for monitoring the performance of the Fund investments. Such undertaking includes monitoring the operations and performance of the businesses to which Limited Partner capital ultimately finds its way (referred to as "Counterparty" in the Private Placement Memoranda). These General Partner's monitoring duties are described as follows:

> The General Partner may reduce or increase exposure to a Counterparty from time to time in its sole discretion according to a variety of factors such as the performance of associated Investments (including relative to benchmarks, peers or expectations), the adherence of the Counterparty to its stated policies and procedures, the responsiveness of the Counterparty to inquiries and requests for information, unexpected changes in the size and composition of the Counterparty's organization, changes in perception of the character and ethics of the personnel of the Counterparty, the emergence of superior investment opportunities, and other considerations deemed relevant by the General Partner.

> * * *

> The General Partner generally reviews and monitors the operation and performance of each Counterparty as frequently as it believes in its sole discretion is appropriate

taking into account the size and level of risk inherent in the applicable Investment. However, the General Partner is unable in practice to monitor every representation, warranty and covenant made by each Counterparty and related affiliates at all times. The General Partner solicits such information from each Counterparty and from other sources that the General Partner deems appropriate in an effort to properly assess the Counterparty's performance, and accordingly the relative success or failure of each Investment.

PPM at 6-7.

47.     The Private Placement Memorandum touts the General Partner's "specific set of statistical and quantitative skills" in evaluating and navigating opportunities and risks that mainstream banks, and even private non-bank lenders are unqualified and unwilling to undertake. *See* PPM at 3.

**G.     Roles and Responsibilities of the Individual Defendants**

48.     The General Partner was, at all relevant times, controlled by Individual Defendants Ross, Mason, and Turner, all of whom who serve, or at relevant times, served, on the Management Committee and the Investment Committee of the General Partner, and, as alleged above, were and/or are Executive Officers of the General Partner.

49.     The Individual Defendants constituted a majority of the Management Committee during the relevant time period, comprising three of its five members. The Management Committee's powers and responsibility is described as follows:

Management Committee. The management committee (the "Management Committee") is a standing committee composed of the General Partner's most senior personnel, including the Chief Executive Officer, the Chief Financial Officer, the Chief Investment Officer, the General Counsel and the Executive Vice President of Research. The Management Committee presides over all major decision making for the General Partner. This committee acts as the steering committee for the General Partner, identifying overarching objectives for the General Partner and the effective, long-term strategies to achieve them. By taking a collaborative approach to firm governance, the Management Committee seeks to enhance transparency between senior managers and mitigates key person risk while providing for better business continuity. The Chief Compliance Officer reports directly to the Management Committee.

50.     As members of the Investment Committee, the Individual Defendants were responsible for approving new investments, monitoring them and otherwise managing the investments:

Investment Committee. The investment committee (the "Investment Committee") is comprised of the Chief Executive Officer [Ross], the Chief Investment Officer [Mason until October 2016, Turner from October 2016 to January 2019] and the Executive Vice President of Research [Mason since July 2015]. The Investment Committee meets regularly and generally focuses on discussion and approval of new Investments, current Investments, follow-on Investments, restructurings, material modifications to existing Investments, portfolio performance, available capital by Counterparty, current and future investment risks, and any other matters impacting the Investments. The observing members of the Investment Committee are the General Counsel, the Chief Compliance Officer, the Vice Presidents of Investments and the Vice President of Asset Management

PPM at 9.

51. As alleged above, Defendants Ross, Mason and Turner were chiefly responsible for conducting due diligence in selecting and monitoring the Fund's investments, including its investments in VOIP Guardian and QuarterSpot. As described in detail below, contrary to the General Partners' representations regarding due diligence, Defendants Ross, Mason and Turner were grossly negligent in selecting VOIP Guardian and QuarterSpot for Fund investment, approving the Fund's investment of 25% of its assets in VOIP Guardian, and failing to monitor the Fund's investments in both VOIP Guardian and QuarterSpot. In addition, Defendant Ross acted fraudulently by arranging with QuarterSpot to falsity QuarterSpot payment information and to falsely report hundreds of fictional payments by QuarterSpot borrowers.

## V. DEFENDANTS BREACHED FIDUCIARY AND CONTRACTUAL DUTIES BY INVESTING IN VOIP GUARDIAN AND/OR AIDED AND ABETTED THE BREACHES

### A. VOIP Guardian Background

52.     VOIP Guardian was formed in September 2015, as a Delaware limited liability company, with its principal place of business in New York City. VOIP Guardian is now located in Santa Monica, California.

53.     VOIP Guardian is in the business of factoring (i.e., purchasing) the receivables of small "Tier 3" telecom providers that purportedly have contracts to provide services to Tier 1 telecom companies, such as Verizon, AT&T, Sprint and other brand-name telecom carriers. The purchased receivables of the Tier 3 telecoms become payable directly to VOIP Guardian by the Tier 1 telecom providers. These expected payments from the Tier 1 telecoms were the collateral against which the Funds lent money to VOIP Guardian. The Tier 3 telecoms are VOIP Guardian's contractual counterparties; the Tier 1 telecoms are VOIP Guardian's – and, thus, DLI and the Fund's – payment obligors. The 2015 Financial Statements of the Fund described VOIP Guardian's business as follows:

> The Partnership provides a revolving loan facility with maximum facility amount of $50 million to VOiP Guardian Partners I, LLC (VOiP Guardian). VOIP Guardian purchases short-term (60 to 90 day) commercial telecommunication invoices (receivables) raised by tier 3 telecom providers that route traffic from calls generated in United States to African and Eastern European countries. The telecom invoices are payable by Tier 1 telecom providers in the United States and Europe that utilize the services of the tier 3 telecom providers to route the traffic. The revolving loan facility had an outstanding principal balance of $32.83 million as of December 31,2015, carried an interest rate of 15% per annum, compounded monthly and has a stated maturity date of September 30, 2020. The Partnership has a collateral security interest in the commercial telecommunication receivables purchased by VOIP Guardian. The Partnership is exposed to the risk of default by the account debtor (tier 1 telecom provider) and the originator of the invoice to the extent the receivable needs to be recoursed back to the tier 3 telecom provider. Such default could result in the Partnership losing value in the underlying collateral leading to lower returns and/or loss of principal on the Partnership's loan facility. The platform sponsor of VOIP Guardian is also the platform sponsor for Talking Capital LLC, another platform from whom the Partnership buys telecommunication receivables directly.

54.     The Funds' investments in VOIP Guardian began in 2015, and increased significantly through 2017. Although the exact dates and amounts of the investments are not available to Plaintiffs

at this time, the Funds' audited financial statements for the following years reveal the total amounts outstanding as of the close of those years:

> (i)     2015: $32.83 million;
>
> (ii)    2016: $99 million;
>
> (iii)   2017: $180 million.

55.     A document titled Look Through Metrics for Asset-Based Facilities, made available to Limited Partners, reported the value of collateral within the borrowing base of each lending platform, including for VOIP Guardian. According to this document, as of September 30, 2018, VOIP Guardian's borrowing base consisted of 462 "unique positions", with an average collateral value of $432,450, totaling $199,791,828.

56.     Contrary to the apparent meaning of the Look Through Metrics document, VOIP Guardian had only five counterparties with receivables of more than $1 million. Worse yet, *over 80% of VOIP Guardian's $192 million in "Notes Receivable" securing its debt to the Fund were notes to just TWO companies: Telacme Limited ($101,165,115) and Najd Technologies Limited ($58,004,470).*

57.     The VOIP Guardian entities are controlled by Omanoff through Omanoff America, LLC.

**B.     At Least by February 2017, Ross Was On Notice That Omanoff Had Been Deceptive, Reckless, or Grossly Negligent in His Conduct of a Business Similar to VOIP Guardian.**

58.     The Fund's initial dealings with Omanoff involved the financing of Talking Capital LLC and entities affiliated with Talking Capital (collectively "Talking Capital"). Talking Capital is in the same business as VOIP Guardian: factoring financing small telecom companies that provide call termination and related services to large telecom companies.

59.     However, the relationship between Talking Capital and Omanoff soured, leading to a lawsuit filed by a founding member of Talking Capital against VOIP Guardian, Omanoff and entities and individuals associated with him, and against Ross, DLI and the Funds. That action, filed on

1   February 24, 2017, in New York Supreme Court, alleges two distinct courses of wrongdoing, the first

2   of which is highly material to this action:[8]

3         (i)    First, Talking Capital alleges that Omanoff, Omanoff America Telecom, LLC,

4   Omanoff related-entities, and Omanoff associates caused Taking Capital to invest and lose $8.5

5   million in Bolotel Ltd, a UK-based Tier 3 Carrier, which disappeared under suspicious circumstances.

6   Talking Capital alleges that the Omanoff-related defendants' decision to invest in Bolotel, without

7   proper or meaningful due diligence, was uninformed and grossly negligent. *Talking Capital* at ¶¶ 44-

8   48. The Funds did not provide funding to Bolotel.

9         (ii)    Second, Talking Capital alleges that VOIP Guardian is a direct competitor of

10  Talking Capital, and that by funding it, Ross and the Funds violated non-compete clauses in the loan

11  agreement(s) with Talking Capital. Omanoff-related defendants are alleged to have breached

12  fiduciary duties to Talking Capital by this same conduct. *See Talking Capital* at ¶¶62-88.

13      60.    The Verified Complaint in the Talking Capital action alleged, in part:

14       •    From 2014 through early 2016, Ross's affiliated companies, including but not
15           limited to the Partnership, made loans to Talking Capital of approximately
         $180 million (including renewals and rollovers of prior financings), and were
16           the leading lending source for Talking Capital:

17       •    In 2016, Omanoff (and others) acted recklessly in causing Talking Capital to
18           lend $8.5 million to a Tier 3 European service provider known as Bolotel
         Limited ("Bolotel"), based on receivables purportedly owed to Bolotel by AV
19           Partners, SRL, a European Tier 1 telecom;

20       •    AV Partners was, in fact, the subsidiary of an entity that had been bankrupt
         since 2010 and, therefore, no longer qualified as a Tier 1 telecom, a fact not
21           disclosed by Omanoff to Talking Capital's investors;

22       •    Invoices reflecting the amounts due to Bolotel from AV Partners were
23           intentionally inflated and falsified to induce Talking Capital to extend
         additional credit to Bolotel;

24

25

26  ───────────────

27  [8] *Talking Capital LLC v. Rodney Omanoff* No. 650973/2017 (N.Y. S. Ct. Feb. 24, 2017). Unless otherwise
specified, citation to *Talking Capital* is to the original complaint. The complaint was amended twice to provide
28  more detail. However, we cite to the original complaint to show what allegations the Defendants to this action
were aware of as of February 24, 2017.

- Omanoff and others failed to conduct proper or meaningful due diligence regarding the Bolotel loan, thereby exposing Talking Capital's funders to millions of dollars of losses;

- The funds ostensibly loaned to Bolotel by Talking Capital were wired not to Bolotel, but to Bolotel FZE, a United Arab Emirates entity different from, and with no clear relation to, Bolotel Ltd. Talking Capital had no direct relationship with Bolotel FZE.

- As of February 2016, Bolotel ceased operating, with no trace of the funds, resulting in a loss of over $8.5 million;

- Omanoff was grossly negligent in the performance his duties and responsibilities as manager of Talking Capital and its affiliates

- The financing application paperwork submitted to Talking Capital by Bolotel in October 2015, was incomplete, failing to answer whether there exists pending litigation against Bolotel, whether licenses have been complied with, and the identity of related entities and Bolotel's shareholders, or carrier and trade references. Also missing from the application were the following items: Bolotel's organizational documents, audited financial statements, copy of network diagrams, information about switching platforms, and letters of reference from two customers/suppliers. Additional red flags included Bolotel banking statements that showed zero balance, service agreements with Bolotel FZE rather than the actual applicant (Bolotel Ltd). In addition, there was no evidence that Bolotel had been awarded any service agreements with Tier 1 Carriers other than with AV Partners, and such service agreement was executed several days after Bolotel submitted its incomplete application to Talking Capital. Talking Capital alleges that these were glaring due diligence lapses by Omanoff and his associates.

61.     According to Talking Capital, "There is a growing sense that Bolotel . . . is a criminal enterprise, making use of a web of international bank accounts to divert, loot or embezzle the loan proceeds from [Talking Capital.]" Id. at ¶49. No explanation was given by Omanoff, Proto, Rahman and/or Lara as what happened with Bolotel. *See id*. at 48.

62.     The Talking Capital second amended complaint, filed February 13, 2019, adds additional detailed allegations about the Bolotel transactions.

63.     Additional glaring problems with the Bolotel story included Bolotel banking statements that showed zero balance, service agreements with Bolotel FZE rather than the actual applicant (Bolotel Ltd). In addition, there was no evidence that Bolotel had been awarded any service agreements with Tier 1 Carriers other than with AV Partners, and such service agreement was

executed several days after Bolotel submitted its incomplete application to Talking Capital. Talking Capital alleges that these were glaring due diligence lapses by Omanoff, Proto and Rahman, who structured and executed the Bolotel transactions. Talking Capital Am. Cpl. at ¶¶ 53-72.

64.      Thus, by no later than February 2017, Ross knew of the Bolotel scandal, and Talking Capital's allegations that Omanoff, among others, had been at a minimum grossly negligent in vetting and monitoring the investment. The allegations against Omanoff should have been flashing red warning signs to any rational fiduciary that had extended credit to another of Omanoff's ventures, particularly a venture in exactly the same business as Talking Capital. These warning signs should have caused the Individual Defendants and the General Partner to refrain from making any additional loans to VOIP Guardian, move to reduce VOIP Guardian's outstanding loan balance, conduct a full investigation to ensure that VOIP Guardian and its counterparties were legitimate businesses, and verify that the invoices purportedly documenting the amounts due to VOIP Guardian from its Tier 1 obligors were bona fide. Instead of acting to minimize the Fund's exposure in the face of the allegations of fraud by Omanoff in his conduct of a similar business, the Funds loaned VOIP Guardian an additional $48 million in 2017.

**C.      The General Partner Concealed Material Negative Information About VOIP Guardian's Condition from the Limited Partners**

65.      The *Talking Capital* action was not timely or properly disclosed to the Limited Partners, and should have been because the allegations were material to the Fund's investment in VOIP Capital, a virtual clone of Talking Capital also controlled by Omanoff. The allegations in the Talking Capital action also related directly to the General Partner's due diligence process. Had Limited Partners known that VOIP Guardian was run by an individual sued for gross negligence in making investments in the telecom factoring business, they could have exercised their right to withdraw their capital. The failure to disclose deprived them of this right.

66.      On or about December 22, 2018, Ross, as CEO of the General Partner, sent a letter to the Limited Partners reporting an estimated return of 0.77% for the month of November 2018. In addition, the letter noted the material selloff in the stock market in the fourth quarter of 2018.

67.     While presenting the Partnership's results as very favorable, especially as compared to the stock market, the letter did not disclose to investors the highly material fact that VOIP Guardian had defaulted on December 2018 payments owed to the Funds.

| 2018 Selected Index Performance* | | | |
|---|---|---|---|
| **Index** | **5-Year** | **3-Year** | **1-Year** |
| **DLIF Class A Interests** | 10.1% | 9.3% | 8.7% |
| **Barclays U.S. High Yield Index** | 5.5% | 7.2% | -2.1% |
| **S&P/LSTA Leveraged Loan Index** | 3.1% | 4.8% | 0.4% |
| **Palmer Square CLO Debt Index (CLODI)** | 4.6% | 6.4% | 0.1% |
| **Barclays U.S. Aggregate Index** | 2.5% | 2.1% | 0.0% |

As shown in this chart, according to the letter the Fund soundly beat both the stock market and debt market in 2018.

68.     On January 29, 2019, Ross, as CEO of the General Partner sent a letter to Limited Partners highlighting the Fund's performance in 2018. Among other things, the letter stated that in 2018, Limited Partners' interests appreciated by 8.7%, net of fees. The letter included links to several articles about the performance of the stock market in 2018, which was negative, and a chart comparing the return on Limited Partners interests with various debt indexes. According to the letter the Fund soundly beat both the stock market and debt market in 2018.

69.     The rosy picture painted by the January 22, 2018, letter, however, was spectacularly false. As the Limited Partners would learn three weeks later, most of the VOIP Guardian investments were likely lost due to misconduct, and defendants knew, before the end of 2018, that VOIP Guardian had defaulted on payments to the Fund.

70.     In relevant part the February 11, 2019, letter signed by Ross as CEO of the General Partner, stated as follows:

Recent Events. From 2015 until November 2018, VOIP Guardian made regular

interest payments due to the Funds. Beginning in December 2018 however, VOIP Guardian missed a portion of its interest payment due to the Funds because it did not receive timely payments totaling $18 million from its own obligors.   VOIP Guardian's obligors are the telecom companies contractually obligated to pay VOIP Guardian for invoices that it "factors."

Although VOIP Guardian received $10 million of its delinquent obligor payments in early January 2019, VOIP Guardian did not receive any further payments thereafter.   During January, VOIP Guardian repeatedly reassured our personnel that the payments would be forthcoming. Given VOIP Guardian's payment history, we found these reassurances to be credible.   VOIP Guardian's amounts due from these delinquent obligors is now $160 million, with the result that VOIP Guardian in turn remains unable to make its payments due to the Funds. We now suspect that the cessation of payments is the likely result of misconduct (although we have not yet determined by whom) and that a substantial portion of the $160 million may not be recoverable.On February 1, 2019, our legal counsel notified law enforcement, and we began taking actions to attempt  to recover any remaining available assets. Specifically:

We engaged Kasowitz Benson Torres LLP to assist in an investigation of VOIP Guardian and its obligors and to pursue potential litigation. Kasowitz has engaged Navigant Consulting, which is an international consulting firm with a specialized asset-recovery group, to assist in its efforts.

Our legal counsel presented the matter to members of the U.S. Attorney's Office (Major Frauds Section). Our counsel continues to provide them with information, and plans to meet with agents from the U.S. Federal Bureau of Investigation in the very near future.

We formally declared an event of default by VOIP Guardian and accelerated all of its loan amounts due to the Funds. We also secured exclusive control over two of VOIP Guardian's bank accounts for its obligor collections, and we now sweep cash out of these accounts.

We notified the Funds' auditor, Deloitte, of the events.

(Emphasis added. Footnote omitted.)

71.     This letter was followed by a February 22, 2019, letter signed by Ross as CEO of the General Partner, which included answers to questions asked by the Limited Partners after February 11. Limited Partners had been asking about the Talking Capital case, which the letter describes as follows:

Forefront Partners has alleged that the founders of VOIP Guardian formed and operated VOIP Guardian as a competitor to Talking Capital in violation of their fiduciary duties as well as of Talking Capital's operating agreement. Forefront Partners has further alleged that DLI provided financing to VOIP Guardian  in violation of a non-competition covenant contained in a master receivables purchase and servicing agreement between affiliates of Talking Capital and of DLI, and that the DLI entities' financing of VOIP Guardian improperly aided others (i.e., Talking

Class Action Complaint

Capital's former equity-holders and manager now affiliated  with VOIP VOIP Guardian) in breaching their fiduciary duties owed to Talking Capital. . .

This description of the case fails to mention the Bolotel allegations leveled against Omanoff and affiliated entities and individuals relating to their failure to conduct due diligence. In light of the massive VOIP Guardian-related losses suffered by the Funds, the General Partner's continuing concealment of the Bolotel-related allegations is telling.

> **D.    The General Partner and Individual Defendants Failed to Exercise Due Diligence By Investing 25% of the Fund's Capital in VOIP Guardian.**

72.    Defendants' decision to invest 25% of the Fund's capital in VOIP Guardian was inconsistent with any rational due diligence process and the due diligence, initial and ongoing, that the Individuals Defendants represented to Limited Partners it would perform. The Individual Defendant's decision to fund VOIP Guardian with material amounts of the Fund's capital was grossly negligent.

73.    VOIP Guardian was a new entity with no operating history whose financing was provided solely by the Fund, notwithstanding the cloud of suspicion concerning Omanoff and his telecom factoring operations. The Individual Defendants could take no comfort that others were doing significant business with VOIP Guardian and sharing the risk.

74.    Given these facts, the Individual Defendants should have exercised the utmost caution and vetted VOIP Guardian and its obligors more thoroughly than it would an established business with a history of repaying creditors, or one that other businesses had sought fit to finance.

75.    By February 2016, Ross and his affiliated companies had become significant backers of the Talking Capital ventures, which was one-third owned by Omanoff. In light of the material, and close working relationship between Ross and Omanoff, by no later than February 2016, Defendants would have known of the Bolotel issues, which culminated in the February 2017 filing of Talking Capital's allegations that Omanoff, among others, had been at a minimum grossly negligent in vetting the investment.

76.    The Bolotel fiasco and allegations against Omanoff should have been deeply worrisome to anyone that had extended credit to another of Omanoff's ventures in the same business.

1   The suspicious Bolotel losses would have caused any rational fiduciary to stop all investments to

2   VOIP Guardian and undertake a forensic analysis of VOIP Guardian and its obligors. Upon

3   information and belief, this was not done, rendering false and misleading the General Partner's claims

4   of due diligence and investment monitoring.

5           77.     VOIP Guardian's Bankuptcy Petition reveals that approximately 75% of the VOIP

6   Guardian receivables serving as collateral for Fund loans are from just *two companies*: Najd

7   Technologies Limited ($58MM) and Telacme Limited ($101MM). These receivables are shown in

8   the Petition as uncollectible in their entireties. This extraordinary concentration of receivables in two

9   companies not only subjected the Fund to heightened risk of nonpayment but also highlights the

10  extreme gross negligence of the General Partner in failing to conduct due diligence regarding VOIP

11  Guardian's counterparties and receivables.

12          78.     Unfortunately, the Bolotel losses foreshadowed all too well the Fund's disastrous

13  losses in VOIP Guardian. Given the amount Ross has said is likely unrecoverable due to misconduct

14  ($160 million out of $191.3 million), and the extreme improbability that all of VOIP Guardian's

15  telecom obligors  -- whose own obligors were supposedly Tier 1 Carriers -- defaulted at the same

16  time, it seems overwhelmingly likely that the Limited Partners have been victimized by wholescale

17  fraud by VOIP Guardian and/or its obligors.

18          79.     Despite knowing that $8.5 million vanished under suspicious circumstances, in a deal

19  orchestrated and vetted by Omanoff and affiliated persons, the Individual Defendants extended

20  $66.17 million of the Fund's capital to VOIP Guardian in 2016, in addition to $32.83 million loaned

21  in 2015. This was followed by another $48 million in 2017, bringing the total VOIP Guardian

22  investment by the Funds to $180 million by the end of 2017.

23          80.      VOIP Guardian' bankruptcy petition reveals that even as VOIP Guardian was missing

24  payments to the Fund starting in December 2018, the Fund continued to increase its exposure, lending

25  VOIP Guardian an additional $3 million in December 2018, and $2,205,140.82 in January 2019.

26  Unsurprisingly, this information has never been disclosed to the Limited Partners.

27          81.     The vast majority of the Fund's loans to VOIP Guardian have been lost, causing

28  material harm to the Limited Partners, who would have exercised their rights of withdrawal had they

1    known the truth about the allegations lodged against Omanoff in the Talking Capital Action, the

2    General Partner's failure to perform due diligence and monitor the performance of VOIP Guardian,

3    or the true level of risk in the VOIP Guardian loans.

4    **VI.    THE FINANCIAL REPORTS PROVIDED TO PROSPECTIVE LIMITED**
     **PARTNERS AND LIMITED PARTNERS WERE MATERIALLY FALSE AND**

5    **MISLEADING DUE TO OVERVALUATION OF QUARTERSPOT INVESTMENTS**
     **AND OVERPAYMENT OF MANAGEMENT FEES**

6

7        82.    Pursuant to the Limited Partnership Agreement the General Partner provided the

8    Limited Partners with annual audited financial statements ("Annual Reports") for the fiscal years

9    2014 through 2017.

10       83.    In addition, the General Partner provided unaudited monthly financial updates by letter

11   and by updates to the Partnerships investment portal that reported to Limited Partners the Fund's

12   monthly return and assets.

13       84.    A material portion of the Partnership was invested through the QuarterSpot platform,

14   a lending platform operated by QuarterSpot, Inc., through which small business obtain loans. The

15   Partnership was an active lender on the QuarterSpot platform.

16       85.    Pursuant to the Annual Reports, the Limited Partnership reported the following

17   relevant metrics:

18
19
20
21

| | **2014** | **2015** | **2016** | **2017** |
|---|---|---|---|---|
| **Partner Capital (net assets)** | $ 107,412,480 | $407,484,592 | $752,251,31 | $658,956,923 |
| **Annual Net Increase of Partner Capital From Operations** | $7,588,834 | $33,514,541 | $77,170,916 | $69,991,032 |
| **Fair Value of QuarterSpot Notes** | $21,700,239 | $61,783,961 | $122,347,560 | $50,014,245 |

22       86.    In fact, and unbeknownst to the Limited Partners, the General Partner was misstating

23   the value of the QuarterSpot investments, failing to write off defaulted loans, and also falsely reported

24   in return figures payments to the Fund from the QuarterSpot portfolio that were never made.

25       87.    According to the SEC Action, between 2014 and 2017, the overvaluation of the

26   reported QuarterSpot investments amounted to the material amount of approximately $53 million,

27   which was equal to 43% of the overall reported value of the investments for 2016 (122 million). The

28

1   overvaluation also constituted more than 7% of the overall assets of the Partnership in 2016. *See* SEC

2   Action at ¶¶ 54.

3       88.     The overvaluation and misreporting was carried out by Ross and principals at

4   QuarterSpot, with Ross actively directing QuarterSpot to falsify borrower payments to QuarterSpot

5   and to under-report delinquencies and writeoffs. *See* SEC Action at ¶¶ 39-50.

6       89.     The inflation of fair value inflated the value of the Partnership's assets and profitability

7   means that the Limited Partners had been overpaying the General Partner for years. As alleged above,

8   the General Partner is paid 20% of the Partnership's Profit and 1% of its assets, which had been

9   inflated. This amounted to approximately $11 million in overstated assets. *See id.* at ¶ 56.

10      90.     With the collapse of the VOIP Guardian investment, and the added revelation that the

11  General Partner had been overstating the fair value of the QuarterSpot investments, it seems very

12  likely that the VOIP Guardian investments had been materially overstated and/or impaired all along,

13  and had not simply gone bad all at once in December 2018.

14      91.     The material misrepresentations and failures to disclose alleged above caused the

15  members of the class to overpay for the interests they received in the Partnership.

16      92.     Had the Limited Partners known of the true financial condition of the Partnership,

17  which was materially worse than represented by the General Partner, they would have exercised their

18  right to withdraw from the Partnership, would not have been damaged by overcompensating the

19  General Partner, and would have avoided massive losses attributed to VOIP Guardian.

20  **VII.   CLASS ACTION ALLEGATIONS**

21      93.     Plaintiffs bring this lawsuit and all claims alleged herein as a class action on behalf of

22  themselves and all others similarly situated as members of the proposed Plaintiff class under Federal

23  Rule of Civil Procedure 23. The class is defined as follows: **Any Limited Partner of the Fund.**

24      94.     Excluded from the class are Defendants, and their legal representatives, officers,

25  directors, assigns, and successors. Plaintiff reserves the right to amend the class and definitions if

26  discovery and further investigation reveal that the class should be expanded or otherwise modified.

27

28

95.     Numerosity: The class is so numerous that joinder of all members is impracticable. Although the exact number of Limited Partners is unknown to Plaintiffs, the number of Limited Partners is believed to be at least several hundred, such that joinder is impracticable.

96.     Commonality and Predominance:  Questions of law and fact exist that are common to the class, and predominate over any question affecting individual class members. Indeed, all of the factual and legal issues in this case can be resolved without regard to Plaintiffs' conduct at all: Plaintiffs' are passive investors that had no control or decision-making authority over Defendants or any decisions, actions or inaction taken by them or not taken by them. These issues include among others:

(i)     Whether the General Partner was not candid with the Limited Partners thereby breaching its fiduciary duties of loyalty to the Limited Partners;

(ii)     Whether the Individual Defendants were not candid with the Limited Partners thereby breaching their fiduciary duties of loyalty to the Limited Partners;

(iii)     Whether the General Partner breached its contract with Limited Partners by failing to give Limited Partners accurate information about the Fund's due diligence and operating and financial condition, thereby depriving them of exercising their right of withdrawal;

(iv)     Whether the General Partner breached its contract with the individual Limited Partners, including the implied covenant of good faith and fair dealing, by its gross negligence in selecting and monitoring of Fund investments;

(v)     Whether the General Partner breached its contracts with the individual Limited Partners, including the implied covenant of good faith and fair dealing, by deliberately misstating the value and performance of the Fund;

(vi)     Whether the General Partner breached its contracts with the individual Limited Partners, including the implied covenant of good faith and fair dealing, by deliberately and falsely inflating its management and performance fees;

(vii)     Whether the General Partner and Ross fraudulently induced the Limited Partners to purchase their Limited Partnership interests;

1          (viii)    Whether the General Partner and Ross knowingly or recklessly caused the class

2  members to overpay for the interests they purchased in the Limited Partnership; and

3          (ix)    Whether Omanoff knowingly participated in the breaches of the other

4  defendants, thereby being aiding and abetting their breaches of fiduciary duties.

5      97.    Typicality: The claims of the representative Plaintiffs are typical of the claims of the

6  prospective class members in that the representative Plaintiff and the prospective class members are

7  all Limited Partners that had no control or say over any decision at issue in this case. The

8  representative Plaintiffs, like all prospective class members, have been damaged by Defendants'

9  misconduct because their Limited Partnership interest have materially declined in value as a result of

10  Defendants' wrongdoing. Furthermore, the factual bases of Defendants' misconduct are common to

11  all prospective class members and represent a common thread resulting in injury to all prospective

12  class members.

13      98.    Adequacy: Plaintiffs are committed to prosecuting the action and have retained

14  competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims

15  of the other members of the class and Plaintiffs have the same interests as the other members of the

16  class. Accordingly, Plaintiffs are adequate representatives of the class and will fairly and adequately

17  protect the interests of the class.

18      99.    Superiority: The prosecution of separate actions by individual members of the class

19  would create the risk of inconsistent or varying adjudications with respect to individual members of

20  the class, which would establish incompatible standards of conduct for Defendants, or adjudications

21  with respect to individual members of the class, which would as a practical matter be disjunctive of

22  the interests of the other members not parties to the adjudications or substantially impair or impede

23  their ability to protect their interests.

24      100.    Manageability: The class action will be easily manageable, as the class members are

25  all in the same position and easily identifiable from records of the General Partner.

26      101.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because

27  Defendants have acted or refused to act on grounds generally applicable to the Class, so that final

28  injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole

102.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

(i)     Whether the General Partner's lack of candor about its lack of due diligence, and/or its deliberate misstatements regarding the performance and value of the Fund constituted a breach of its fiduciary duty of loyalty to the Limited Partners;

(ii)     Whether the Individual Defendants' lack of candor about their gross negligence in the selection and monitoring of investments and due diligence, and/or about the true value and performance of the Fund constituted a breach of the fiduciary duty of loyalty to the Limited Partners

(iii)     Whether the General Partner breached its contracts with the individual Limited Partners, including the implied covenant of good faith and fair dealing, by its gross negligence in selecting and monitoring investments;

(iv)     Whether the General Partner breached its contracts with the individual Limited Partners by failing to give Limited Partners accurate information about the Fund's due diligence and operating and financial condition, thereby depriving them of exercising their right of withdrawal; and

(v)     Whether the General Partner and Ross fraudulently induced the Limited Partners to purchase their limited partnership interests.

## <u>COUNT I</u>
**Breach of Fiduciary Duty of Loyalty Against General Partner Direct Lending Investments LLC**

103.     Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

104.     By reason of its position as a fiduciary of the Partnership, and by operation of law, and because of its ability to control the business and corporate affairs of the Partnership, the General Partner owed the Partnership and its Limited Partners the fiduciary duty of loyalty, requiring them to act in good faith with respect to the Limited Partners, to be candid with the Limited Partners by

1    disclosing to them complete, truthful and accurate information about the Limited Partnership's

2    operations and financial conditions.

3        105.    The General Partner, far from acting in the best interests of the Limited Partners and

4    being honest with them, lied to them about its due diligence process, failed to disclose material risks

5    and the truth behind the VOIP Guardian investment, understated the risk in investing in the Limited

6    Partnership, lied about the value of Limited Partnerships which were not valued in good faith, and

7    lied about the returns to the Limited Partners, all of which benefitted the General Partner at the

8    expense of the Limited Partner by directly inflating the fees the General Partner collected from them

9    and depriving them of the truth about their investments which prevented them from exercising their

10   right of withdrawal all the while paying fees based on capital that would have fled if the truth was

11   known.

12       106.    The General Partner had defined investment discretion in investing Limited Partners'

13   capital within the framework that it had promised would be followed. As alleged above, the General

14   Partner undertook to "review[] and monitor[] the operation and performance of each Counterparty as

15   frequently as it believes in its sole discretion is appropriate taking into account the size and level of

16   risk inherent in the applicable Investment."

17       107.    The General Partner caused the highly material amount of 25% of the Fund to be

18   invested with VOIP Guardian, beginning in 2015, and continuing through 2017. This was a massive

19   investment in a new business funded in large part by capital from the Limited Partners. In addition,  as

20   alleged above, by February 2016, the General Partner knew that an $8.5 million loan to Bolotel

21   disappeared under highly suspicious circumstances. In light of the highly concentrated nature of this

22   investment, the General Partner duty to monitor VOIP Guardian and its counterparties was greater

23   than its duty to monitor its other, less concentrated investments. Shockingly, the General Partner

24   failed to secure the money it had invested in VOIP Guardian prior to February 2016, and instead

25   continued to invest in VOIP Guardian in 2016 and 2017, and continued to invest even in December

26   2018 and January 2019 after VOIP Guardian had missed interest payments to the Fund. These actions

27   are not consistent with any rational due diligence process or the responsible monitoring of investments

28   that it was obligated to undertake and which it represented it did undertake. Responsible fiduciaries

1   in the General Partner's position would have foregone investing the capital of Limited Partners in

2   VOIP Guardian or, at the least, would have done so only after exercise extreme caution, and would

3   have invested immaterial amounts.

4       108.   The General Partner breached the duty of loyalty to Limited Partners by failing to

5   candidly describe its true due diligence process, and because it failed to disclose and materially

6   misrepresented the Fund's true financial condition and operations. Contrary to its representation that

7   it would monitor counterparties, the General Partner invested significant amounts in VOIP Guardian,

8   a brand new enterprise funded in large part by the Fund itself, run by an individual (Omanoff) whose

9   own due diligence was known by the General Partner to be highly suspect. Had the General Partner

10  in fact implemented the initial and ongoing due diligence and risk assessments it represented it would

11  do, the Limited Partners would not now be faced with an abrupt 21% loss of capital due to misconduct.

12      109.   The General Partner failed to disclose to Limited Partners the true risk inherent in its

13  VOIP Guardian investment which was in fact portrayed to Limited Partners in a manner that created

14  the reasonable but false impression that these were relatively low risk loan secured by the accounts

15  receivable of Tier 1 Carriers, which are (supposed to be) blue-chip companies like AT&T, Verizon,

16  Deutsche Telecom, that are exceedingly unlikely to default on its accounts receivable.

17      110.   The General Partner acted in bad faith and was not candid with the Limited Partners

18  because its Annual Reports materially overstated the Partnerships' capital, operational success, and

19  the fair value of the QuarterSpot investments which were material to the Fund's overall value.

20  Moreover, the General Partner was not candid with Limited Partners in its letters of December 22,

21  2018, and January 31, 2019, and other similar letters it sent, which regularly touted that the Fund's

22  return was much better than the returns for the major stock market and various debt indexes. By then

23  the General Partner knew that VOIP Guardian had missed its interest payments to the Fund for

24  December 2018, supposedly because of defaults by VOIP Guardian's obligors, and that only $10

25  million of $18 million unpaid in December was remitted by VOIP Guardian's obligors in January.

26  Neither letter to the Limited Partners disclosed any issue with VOIP Guardian's payments in

27  December or January. It was only on February 11, 2019, in the letter to the Limited Partners signed

28  by Ross, as CEO of the General Partner, that Limited Partners learned of the missed payments, and

Class Action Complaint

the likely loss of most of the investment in VOIP Guardian due to misconduct. Moreover, such letters were materially false and misleading because they presented inflated fair value for the QuarterSpot investments.

111.   The overstatement of the fair value of the Partnership's QuarterSpot investments overstated the Fund's gross capital, which led to the General Partner collecting inflated fees based on those inflated values.

112.   The Partnership and its Limited Partners have been damaged by the General Partner's breach of fiduciary duties by, *inter alia*, being deprived of the ability to exercise their right of withdrawal based on accurate information, which resulted in a material diminution in the value of their individual capital accounts.

## COUNT II
### Breaches of Fiduciary Duties Against the Individual Defendants

113.   Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

114.   The Individual Defendants, as alleged above, were senior officers of the General Partner, tasked with managing its operations and with making all investment decisions. The Individual Defendants comprised the General Partner's three-member Investment Committee, and constituted a majority of its five-member Management Committee during the relevant time. The Individual Defendants exercised actual control and domination of the General Partner at all times relevant to this action and in ways relevant to this action, and owed fiduciary duties to the Limited Partners.

115.   The due diligence and initial and ongoing risk assessments the General Partner promised to undertake in investing Limited Partner capital, as alleged above, was in fact carried out by the Individual Defendants, according to policies and procedures that they designed and implemented.

116.   The Individual Defendants breached their fiduciary duties loyalty for the same reasons as the General Partner, as alleged above, and are responsible for the damages therefrom to the Partnership and Limited Partners.

**COUNT III**
**Aiding and Abetting Breaches of Fiduciary Duties Against the Individual Defendants In The Alternative To Count II**

117.     Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

118.     This Count III is pled in the alternative to Count II. If it is found that the Individual Defendants did not breach fiduciary duties.

119.     The General Partner owed fiduciary duties to the Partnership and its Limited Partners, and, as alleged, above, breached those duties.

120.     The Individual Defendants were senior officers of the General Partner and managed its operations and made all of the investment decisions, including the decision to invest in VOIP Guardian, and the initial and ongoing due diligence and risk assessments of those investments.

121.     Accordingly, the Individual Defendants knowingly participated in the breaches of fiduciary duties by the General Partner, which damaged the Partnership and the Limited Partners.

**COUNT IV**
**Breach of Contract Against the General Partner**

122.     Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

123.     The Limited Partnership Agreement is a valid contract between each Limited Partner and the General Partner, with due consideration paid by each of them in the form of mutual promises to perform.

124.     The Limited Partners performed their ends of the bargain with the General Partner by submitting to the General Partner money and completed forms, which were accepted by the General Partner.

125.     The General Partner breached the contract with the General Partners as follows:

(a)     The General Partner is contractually obligated to each individual Limited Partner to keep "full, complete and accurate books of account," provide each Limited Partner with accurate financial reports, and value the Fund's investments in good faith. By materially overstating

1  the fair value of the QuarterSpot investments and failing to value the QuarterSpot investments in good

2  faith, the General Partner breached its contract with each Limited Partner.

3          (b)     The General Partner misrepresented its due diligence process, and the true

4  value of its VOIP Guardian investments which were in fact materially impaired.

5          (c)     The General Partner, by presenting the limited Partners with a falsely positive

6  view of the financial condition of the Partnership, deprived the Limited Partners of the ability to

7  exercise their rights of withdrawal, which they would have done. Now that the truth about the

8  Partnership has been disclosed, the General Partner has frozen all withdrawals.

9          (d)     As alleged above, the Limited Partners agreed to (indirectly) pay the General

10  Partner 20% of profits and 1% of gross assets as its fee for managing the Partnership. Such fees were

11  deducted by the General Partner from the Master Fund, without Limited Partners authorizing any

12  particular payment. Because the assets of the Fund and Master Fund were overstated, the Limited

13  Partners have been overpaying the General Partner pursuant to the Partnership Agreement.

14  Accordingly, the General Partner breached its compensation provision.

15      126.    These breaches have proximately damaged the Limited Partners by stripping them of

16  their contractual right to timely withdraw from the Partnership.

17
                                 **<u>COUNT V</u>**
**Breach of the Implied Covenant of Good Faith and Fair Dealing Against**
18  **the General Partner**

19      127.    Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set

20  forth herein in their entirety.

21      128.    The Limited Partnership Agreement is a valid contract between each Limited Partner

22  and the General Partner, with due consideration paid by each of them in the form of mutual promises

23  to perform.

24      129.    The covenant of good faith and fair dealing is an implied term in the Limited Partners

25  Agreement.

26      130.    As alleged above, the contract provided Limited Partners with rights of withdrawal,

27  which was the only way to liquidate Limited Partnership interests. The implied covenant of good faith

28

and fair dealing imposes a duty on the General Partner to not interfere unfairly with this right. As alleged above, the General Partner did interfere with this right by failing to disclose and actively misrepresenting facts that, were they known by the Limited Partners would have caused them to exercise such right thereby avoiding significant loss of capital. As a result of its own wrongdoing, the General Partner invoked the limitation on withdrawal, claiming such limitation was in the best interest of Limited Partners.

131.    The Limited Partnership Agreement also provided that the General Partner had sole investment discretion. The implied covenant of good faith and fair dealing required the General Partner to perform reasonable and adequate due diligence prior to making investments and to re-evaluate them. As alleged above, the General Partner failed to do this, thereby depriving the Limited Partners of their right to withdraw from the Partnership.

132.    The General Partner's breach of the implied covenant of good faith and fair dealing proximately damaged the Limited Partners.

### COUNT VI
**Aiding and Abetting Breaches of Fiduciary Duties Against Omanoff**

133.    Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

134.    The General Partner and the Individual Defendants owed fiduciary duties to the Limited Partners and breached those duties.

135.    Omanoff's factoring business, VOIP Guardian, was financed with $190 million in capital from the Funds, and the Omanoff actively solicited capital from the Limited Partners through the Funds. Approximately $160 million loaned to Omanoff's business by the Fund is now missing and likely unrecoverable. Omanoff knew the Fund was a limited partnership and that the General Partner and the Individual Defendants Ross, Turner, and Mason owed fiduciary duties to the Limited Partners. Omanoff knew that the General Partner and the Individual Defendants performed grossly inadequate due diligence regarding VOIP Guardian's loans because adequate due diligence would have required his participation.

136.   Accordingly, Omanoff knowingly participated in the fiduciary breaches by the General Partner and Individual Defendants and is liable for the significant damages suffered by the Limited Partners.

**<u>COUNT VII</u>**
**Aiding and Abetting Breaches of Fiduciary Duties Against QuarterSpot**

137.   Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

138.   The General Partner and the Individual Defendants owed fiduciary duties to the Limited Partners and breached those duties.

139.   As alleged above, QuarterSpot was actively engaged with the General Partner in overstating the returns to the Partnership from the Partnership's QuarterSpot investments. The overstatement was material and led to a material overpayment of fees by the Limited Partners.

140.   Accordingly, QuarterSpot knowingly participated in the fiduciary breaches by the General Partner and Individual Defendants and are liable for the significant damages suffered by the Limited Partners.

**<u>COUNT VIII</u>**
**Fraud in the Inducement Against the General Partner and Ross**

141.   Plaintiffs hereby incorporate all foregoing paragraphs as though the same were set forth herein in their entirety.

142.   Beginning in 2014, the General Partner and Ross materially overstated the performance and value of the Fund in documents they provided to prospective limited partners.

143.   The General Partner and Ross knew the financial information they provided to prospective limited partners materially overstated the performance and value of the Fund.

144.   The General Partner and Ross provided the false information to prospective limited partners with the intent to induce them into purchasing limited partnership interests in the Fund.

145.   The prospective limited partners who became Limited Partners justifiably relied on the falsified financial information provided by the General Partner and Ross in making their decision to purchase Limited Partnership interests.

- 36 -
Class Action Complaint

146.    Plaintiffs and the other current Limited Partners were damaged by the fraudulent conduct of the General Partner and Ross in that they were induced to purchase interests in a Limited Partnership at higher prices than they would have paid had the financial information they received been true and accurate.

147.    Plaintiffs and the other current Limited Partners were damaged by the fraudulent conduct of the General Partner and Ross in that, had they known the General Partner and its Managing Member were actively engaged in a fraudulent scheme to overstate the performance and value of the Fund, they would not have purchased Limited Partnership interests at all.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

148.    Certifying this case as a class action; certifying Plaintiffs as class representatives and their counsel as class counsel;

149.    An award to Plaintiffs and the class all forms of recovery allowed under law and equity including rescission, restitution, disgorgement, injunctive and other equitable relief, and compensatory and punitive damages.

150.    An award of attorneys' fees and costs, as allowed by law;

151.    An award of pre-judgment and post-judgment interest, as provided by law;

152.    Such other relief that the Court deems just, equitable, and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable.

1

2    DATED:   April 1, 2019                    MILBERG TADLER PHILLIPS GROSSMAN LLP

3
                                              By: _____/sDavid E. Azar_____
4                                                             David E. Azar

5                                             DAVID E. AZAR (SBN 218319)
                                              11766 Wilshire Blvd., Suite 500
6                                             Los Angeles, California 90025
                                              Telephone: (213) 617-1200
7                                             Facsimile: (212) 868-1229
                                              dazar@milberg.com
8

9                                             HENRY J. KELSTON
                                              ANDREI RADO
10                                            One Pennsylvania Plaza, Suite 1920
                                              New York, New York 10119
11                                            Telephone: (212) 594-5300
                                              Facsimile: (212) 868-1229
12                                            hkelston@milberg.com
                                              arado@milberg.com
13

14                                            Counsel for Plaintiffs and the Proposed Class

15

16

17

18

19

20

21

22

23

24

25

26

27

28